and take a brief recess before finishing the docket, and we begin with United States v. Pawlak. Mr. Curtis. Thank you, Your Honor. May it please the Court, my name is Chris Curtis and I represent Daryl Pawlak, the appellant in this case. I've raised five issues in my brief and I don't intend to waive any of those issues, but I do want to immediately go to two of the issues that I believe require, under the case law on the authority side, require a remand in this case, and that's the first issue that I want to go to is obstruction of justice, the two-level enhancement, and then the second one would be the Rule 41 ruling without having a hearing on the good faith determination. Regarding the obstruction of justice enhancement under 3C1.1 of the guidelines, remand is required. The district court erred by applying that two-level enhancement for two reasons. First of all, this was not an attempt. The conduct of Mr. Pawlak did not rise to a level of an attempt to obstruct or destroy the evidence in this computer. Second of all, the application note 4D would require, or the exception that is contained within that application note should apply in this case and prevent the two-level enhancement. A thorough review of the record in this case, actually what it reveals is that Mr. Pawlak was cooperative with the government from the beginning. On the day that a search warrant was being executed at his house, he was in West Texas at his office in West Texas, not in his home in Burleson, Texas, and he received a phone call about 6 or 6.30 in the morning from the FBI agent. He talked with that FBI agent for about an hour and a half. He was cooperative with her. He made incriminating statements during the course of that conversation. The conversation ended and at some point after that conversation ended, he looked at the possibility of wiping his computer. He didn't wipe it. He didn't run any programs to clean the evidence off of his computer. After that point, he received a call back from the FBI agent who asked him to, or told him, he's going to have to turn that work computer over to the FBI. And his response was, well I need to give it to my employer and they can give it to you, but that's the way I'm going to do it. That was about, well I'm not sure what time in the morning that was, but it was after 9 o'clock in the morning. He turned his computer over to his employer at 11 o'clock that morning. He had plenty of time to destroy the evidence and he didn't. And I think maybe that's perhaps the most important consideration on this issue is he didn't destroy any evidence. So he did not try to wipe his computer while the FBI agents were searching his house? No he didn't, Your Honor. It was, well, I don't know. That may or may not be true because they could have still been searching when he got off the phone with the agent. He never tried to do that and there's no factual determination about that? There is none that he ever tried to wipe it. Now the pre-sentence report says, it kind but he wasn't able to because he didn't have a hard drive. That's what they said. Or actually it doesn't even say anything about the hard drives. It says he wasn't able to. And that's not what he said. When the agent called back and said he needed to turn the computer over, what he told the agent was, well I looked at wiping it but I didn't do it. I didn't have a hard drive. And it's also important to note on this issue that the FBI expert, Mr. Ates, Dr. Ates actually, testified that it would have taken seven steps to wipe that computer clean. And it didn't happen. He only, there was no evidence that he ran the program or that he installed the program. I'm very confused. Yes. Didn't he, in an unrecorded conversation, admit that he tried to wipe the contents of the hard drive of his current work computer? I'll read the quote exactly. Agent Wilkinson said that in an unrecorded conversation, this is a quote, he had looked at wiping the computer but was unable to because he did not have a hard drive, hard disk. He had to have some sort of external hard drive. So his lesser angels tried to persuade him to do this but it was difficult technologically so he abandoned that effort and never did it. I don't know that it was all that difficult. I think according to Dr. Ates' testimony, all he needed was a thumb drive or a disk. Okay, but because he didn't fulfill it correctly is why he shouldn't get the enhancement? No, because he had every opportunity. He could have done that. That's what's not in Agent Wilkinson's testimony. It's not in her testimony also that that wasn't done after she had told him he has to turn his computer over. He ran a search for a program to wipe the computer clean and downloaded it but that was before she had said he had to turn his computer over. I think that's important and this was in the context of her saying you're going to have to turn that computer over and he said well I thought about wiping her. I looked at wiping it and I was unable to because I didn't have a hard disk. He still had that computer in his control and he still had all the time in the world if he needed to go get a thumb drive or a hard disk and he didn't. So his actions were consistent, Your Honor. I think yes, no question about it. He had a thought about well I might wipe this evidence off of this hard drive but he didn't do it and he had every opportunity to do it. So my argument is that him downloading the wiping program, the DBAN I think is what it's called, was not anything more than mere preparation. He didn't do anything to install it. He didn't do anything to run it. He didn't do anything to execute actually wiping the computer clean and he had every opportunity in the world. The second reason why I think it needs to be remanded on this is that application note four which is the contemporaneous with arrest. If you destroy evidence contemporaneous with arrest but it doesn't hinder the investigation or prosecution then you don't get the two level increase and the fact circumstances here essentially fit within that application note. The difference is that he was remote. He wasn't there at the house but that application note is intended, let me back up a minute, that application note is intended to apply when the police come to the door and they knock on the door with a search warrant or arrest warrant and the defendant runs and flushes his drugs down the toilet or he runs to his computer and throws, you know, deletes all of his computer files. And what's the standard of review for this? It's a good question, Your Honor. I said in my brief it was clearly erroneous but I think there's an application question here too because I'm not sure how, certainly not all the facts are in dispute. Certainly both sides agree to some of what the facts are here but I'm saying that under these facts and that application note he should not have gotten the increase so I think that's a legal de novo question for the court. Is there some issue that this could have been determined factually? Was it properly preserved such that the court cleared this up the best it could at the trial level? You know what I'm talking about. If it has a factual component and you don't try to get it cleared up then it's on your client. Well, but I don't think there's any kind of waiver here. We did object and he raised this argument that I'm raising, both components of it. Was it very clear to the court that this was what you were maintaining? I believe so, Your Honor. I know this record is 4,000 pages long so forgive me if I've overstated that. I don't think I have though. I think that they filed the written objection and made what I raised on appeal is consistent with what was raised to the district court. And I believe that the application note should apply. The facts of this case are even more concerning than this. He didn't destroy any evidence at all, number one. And that application note applies to where somebody actually does destroy evidence. He didn't. He had every opportunity to destroy that evidence but didn't do it. He could have still done it even after he downloaded it and the FBI agent talked to him and said, hey, you've got to turn this thing in. He had all the time. He had control of the computer at that point. Instead, he turned it over to his employer and left his job and left it there for them to turn over to the FBI. So he did the right thing. Could I ask a question about the virtual image issue? Yes. Was that preserved properly? And if not, does it satisfy prong three? I believe, Your Honor, it was preserved properly because there was a Rule 29 motion on sufficiency of the evidence. But did it specifically direct the court to that testimony that the officer had not said this particular universe of images was real as opposed to this other particular group of images? I don't think that was distinguished. So it would have to be. So what's the standard of review if it's not particularly? Well, I think a general Rule 29 does preserve the issue whether it's sufficient. I could be wrong about that, but my understanding is that we're not required to make the specific Rule 29. We're not required to get down in the weeds, if you will, on our Rule 29 insufficiency, but I could be wrong about that. Does it affect the sentence materially? I'm sorry, Your Honor. Does it affect the sentence? How much does it differ? Could it differ? On the obstruction? No. Or on the images? On the images. On the images. Okay. On the number of images? Yes, because it's a different number of images than that get calculated. Or is the threshold so that it's already met it with the one group? Well, there's two computers here. There's the Sigma computer, which is both counts of indictment are the Sigma computer. Then there's the independent oil computer, which is the one I'm talking about for the obstruction. And that one had, according to the testimony, it had 800 images in it, in the independent oil. And there was not an objection to the number of images used. I guess my issue is if we vacated the, and I'm not foreshadowing by any means. I understand, Your Honor. If we vacated the count two conviction because those images were virtual, then it doesn't affect the sentence, though, because it was concurrent on the other count. You're exactly right, Your Honor. So it doesn't really matter, does it, even if you were to win on that? I completely understand your question. I didn't get that at first. You're exactly right, Your Honor. If you vacated count two but didn't vacate count one, it doesn't make a difference on his guidelines. That's not a winner of an argument to get your client less time, like the obstruction of justice. Unless we prevail on count one as well. And I think, actually, we may be mixing those two up. I get that mixed up. But I understand your question, Your Honor. I'd also, I wanted to talk about the Rule 41 violation. I think it's pretty clear under almost all the courts who have addressed this issue that there was a Rule 41 violation here, that the warrant did not comply with the requirements of Rule 41. They went to a West Virginia magistrate judge as opposed to they would have had to go to a district court judge if they're going to go out of district to get a search warrant for this district. And our argument is that I think under Comstock, there's no question the district court should have given a hearing on the issue of good faith. Now, ultimately, the court found good hearing to question the affine on this case to determine whether he actually had good faith. And under Comstock, it's clear. This court has held that for purposes of Rule 41 violation that you have to, the good faith requirement requires subjective good faith or individualized good faith by the officer himself. And in Comstock, in fact, what happened was the, I'm sorry. I got distracted by the yellow light. The officer did testify. There was evidence that the officer said, oh, I messed up. I thought it was a court of record, and it turns out it wasn't. And so, in fact, you had that evidence in Comstock. And we didn't get that in this case. We asked for it, and I think under the controlling precedent in this court that that has to be remanded to the district court for that determination. Remind me, was there anything in Ganser that covered any of that? Your Honor, I read Ganser. Comstock is cited in a footnote, but the issue of whether there should have been a hearing is not addressed at all that I can determine in Ganser. Ganser rules on the good faith issue like most of the other district, I'm sorry, courts of appeals across the country that have dealt with these playpen cases, and that is they just found good faith without addressing whether there had to be a hearing. So I'm not sure that it was raised. You know, I'm not sure that in that particular case it actually got raised, a request for a hearing. And that, so I don't think Comstock answers, I'm sorry, Ganser answers the Comstock question that I raised. I believe that those two issues require remand in this case. I do think also, I realize that all the courts that have addressed outrageous government conduct in this consternation have not gone in favor of my argument. But I do want to quickly, while I have a few seconds left, address the fact that this is a case that is far distinguishable from the other outrageous government conduct cases out of this district. This was... If you want to take part of your rebuttal time, you may. I will do that. I will address that on my rebuttal. Or I can take it now. Take it now. I think I better do that, Your Honor. Respond. What happened was the government violated the law here. They specifically violated the law and distributed child pornography. Thousands of images, maybe a million. Were they adding to it or were they just running an existing site? Well, they were running an existing site, but they added what's out there in the Internet, either. I mean, what they put out there... They didn't add images to the existing site. So actually increase the number of images in circulation in any way through this website. Or did they just maintain an existing site? There's a controversy over whether the government can add images into a site because that's increasing the demand for child porn. But... I don't believe they added... I don't think they added issues to the website. They did not add any child porn or virtual or real images to the website. But they certainly added what's out there on the web and what is out there on individuals' computers that get shared and distributed and passed along. And, of course, under their own logic, they victimized. We have third-party victims in this case, too. This is another reason why this is completely different than the drug cases where the government supplies all the materials and equipment to somebody who makes methamphetamine. It didn't happen like that in this case. The government distributed child pornography for two weeks. They victimized those kids, just like our defendants have been... The courts have held that our defendants are victimizing these children. And I understand that by viewing this. Well, my client viewed it, but the government distributed it. Is there evidence in this record of any particular victims or any that were not already in the pool of the victims or anything like that? Any specific evidence in this record? There's no evidence in the record that I'm aware of of that, no, Your Honor. But I do want to point that out. The difference between this particular case on the issue of outrageous government conduct is, number one, we've got third-party victims. You don't have that with a drug case. And even in the Benson case, the images were recovered. It was a controlled delivery, so they recovered the images. Number two, you've got the government specifically violating the law. There's an exception in drug cases for the government to sell drugs, to do reverse things. It's in 8085 and Title 21. There's no such exception for child pornography. And there's 3509, which specifically requires that the government must maintain control over those images. And they didn't do that. They distributed them. And number three, my use this Court standard for there has to be passive participation, that when you compare that to what the government did in this case, that was passive participation. And I think that the government has said that I have said that this issue is foreclosed, and I didn't mean to say that. If I did, what I said was I was preserving the issue of whether that Your initial time now has expired. Thank you, Your Honor. Mr. Curtis will have four minutes on rebuttal. Mr. Magliela? Thank you, Judge Smith, and may it please the Court, Joe Magliela of the United States. The overwhelming evidence in this case, including Mr. Povlock's recorded confession in which he admitted to being a longstanding and active consumer of child pornography involving prepubescent little girls, strongly supports the jury's verdict on both counts against him. Furthermore, the outrageous government conduct offense is categorically foreclosed under three decades of this Court's precedent in a situation where a defendant like Mr. Povlock is admittedly an active participant in the criminal behavior about which he now complains. The District Court also did not clearly err when it imposed the two-level enhancement based... Did he distribute and share? Excuse me, Your Honor? Did he distribute and share? No, Your Honor. He only viewed? Yes, Your Honor. And to the extent... Did the government distribute anything that was not already on that site? Absolutely not. At the time it took it over? Absolutely not, Your Honor. Did it distribute it to new people who were not already subscribers so that they're increasing the demand and consumers of child porn? I don't know that the record is instructive on that point, but what I can say is that the number of total users on the Playpen website in the two weeks during which the FBI allowed it to run was about the same as the amount of users in the two weeks preceding that. So the FBI takes over the website, but it takes down the worst parts of the website, the part of the website that encouraged the Playpen users to produce new child pornography. And it was authorized by a court to let this operation run for 30 days, but they decided to only limit it to 13. And I... Is that because something happened that was a problem or anything? I don't think there's a problem, Your Honor. I think essentially probably they just reached a critical mass of people that they identified whose IP addresses... Not too many people to pursue and convict at that point. I think that... They didn't need anymore. Almost certainly that's the case, Your Honor. I mean, this network investigative technique was put in the parts of the website that the FBI deemed to be the worst. And imagine what is the worst part of an already horrendous child pornography website. And one of the parts of that website was the pre-teen hardcore section, which is where children are depicted in penetrative sexual... Understood, Your Honor. But in any event, having done that, they identified about 1,300 people in this country and I think over 7,000 internationally. So that leads to enough to not require the operation to go on any further. But with respect to the... So was he a passive consumer? Absolutely not, Your Honor. What the evidence shows is that Mr. Pavlak, he admitted to Special Agent Wilkerson on October 1st, 2015, to having been a long standing consumer of child pornography for three to four years before that time, which is to say at the latest he started consuming child pornography... What would be a passive consumer? I thought passive meant that he wasn't out in there trading it and talking about it and trying to acquire it. He's just going to the readily available source and downloading it. I don't think there's anything in this court's case law that suggests that, Your Honor. And it should be noted, this court has never found the outrageous government conduct to apply to anybody under any circumstances. And to my knowledge, I think only two circuit courts in the entire history of federal jurisprudence under any circumstances have found it to apply. But I think all it looks at is whether or not in the charge conduct, whether or not the defendant is an active or passive participant. And he's not charged with distribution or production or pushing this on anyone else. So is that considered in the... With the DOJ, is that considered active or passive? And how is that defined in your industry? In our industry, somebody who spends 14 and a half hours on this child pornography website before the FBI even gains control of it, which the evidence shows. What's the amount of time makes you active as opposed to what you're doing with the images? I don't know that the DOJ has a particular definition. I mean, Mr. Pavlak was identified not by the amount of time he was spending on the website, by the fact that he was going to one of the particularly bad parts of the website. But I think under this court's case law, the evidence supports the conclusion that Mr. Pavlak was an active consumer, given that he was consuming this stuff for years beforehand, that he was a member of the playpen website before the FBI, before it even got on their radar screen, and certainly before the FBI took it over. Should we consider at all the third-party victims in determining whether this is proper government conduct? You know, every time the images in the in-ray, Amy gets... There's an additional charge for that. Isn't the government also participating in that? I understand the court's concern, and at first blush, it certainly gave me pause, too. But I think the sort of scope of the problem is what led to this particular operation, which I know is different probably than other operations the FBI had run. This website was one of the largest collections of child pornography, I think, that the investigators had seen on the Internet. And given the sophistication of the dark web technology, this TOR software, people could view it essentially anonymously. And even when the FBI found this computer, found the server that was hosting this website, they still couldn't identify the people who were consuming the child pornography, and they couldn't identify the people who were producing new child pornography. So in all the cases that have addressed this, whether the government's acted properly or not, have they addressed the issue of third-party victims? Your Honor, to my knowledge, the only circuit courts to address it are in the Seventh Circuit and in the First Circuit. The Seventh Circuit dealt with it in a summary fashion, saying that it didn't apply. The First Circuit also found that the outrageous government conduct defense did not apply. I think it gave the court a little more pause, which is understandable, but they still found based on the scope of the issue. But to your question,  no one's discussed the third-party victim issue and the re-victimization of the minors? I think that it has almost certainly been discussed in the host of district court cases that have also found no outrageous government conduct. But not in the circuit courts? No, not to my knowledge, Your Honor. It's only come up two times in the Anzalone decision in the First Circuit, which came out earlier this year, and the Keenass decision from the Seventh Circuit from last year. Can you address the issue with regard to the virtual images on count two? I'd be happy to, Your Honor. In the wake of the Free Speech Coalition decision, this court, joining I think every other circuit court aside from the Fourth and D.C. Circuits, has found that it is the government's burden to prove that each child is real. And so I will concede, I think, that based on his Rule 29 motion, he has preserved that under the typical sufficiency standard. But the witness is real vague and seems to be talking about the other images. The witness looking at the testimony. Can you point me to anything that specifies that he proved that all were real when he's talking in the context of his other computer images? Okay, certainly, Your Honor. So this court's standard, just to step back, doesn't require expert testimony to prove that the children depicted are real. But it needs something. Well, I mean, what this court has found in McNeely and Slonina is that the jury can, when viewing an image, the images can effectively self-authenticate and where there's nothing else in them. It's not really reliable. I understand in previous eras. But the technology has gotten so good now that it's very hard for people to tell, you know, even certain Photoshopping without forensic. So you're just saying layperson juries, when they're looking at really offensive images, can tell right away whether or not they're real or virtual in this day and age when virtual is so realistic? I'm sure there are a host of images where that is the case. Having had to view the images myself, the jury viewed them. There's nothing about these images that suggests they are anything than what they were charged to be, which is prepubescent girls involved in sexualized situations. But it's also worth noting, Your Honor, I think that the government put on a great deal more evidence about these images. And I appreciate that Special Agent Alfin's testimony was not completely unequivocal on this point, but he did say they appeared to him to be real children. He wasn't talking about the Count II images, was he? He was, Your Honor. He was speaking. How can you tell me that? Tell us that. Your Honor, he was speaking. Well, I can testify. The Count II images were the images that were on March 4, 2015, on the Playpen website. Special Agent Alfin was the sponsoring witnesses for these exhibits. It's Government Exhibits 39 and 40 and 43 and 44. And I'd be happy to talk about, I think, his testimony about these particular images. I mean, he's talking about Government Exhibit 39 on page 1570 of the record. He's talking about Government Exhibit 40 on pages 1574 and 1575 of the record. Exhibit 43 on pages 1574 through 1579 of the record. Government Exhibit 44 on 1579 and 1580 of the record. But that is, I believe, powerful evidence in our favor, but that's not nearly the only evidence, because Special Agent Wilkerson testified later in the trial about all of the images the jury has seen. And I think it's important to talk about why we know she's talking about all the images and not just the images for which she was the sponsoring witness. Special Agent Wilkerson was the case agent on this trial. She was present for the entirety of the trial, and that's reflected on page 1887 of the record. Mr. Pavlok's counsel asked Special Agent Wilkerson, you have seen the entirety of the trial, correct? Yes. Many images have been shown to this jury, right? Yes. Then she goes on, on pages 1889 and 1890 of the record, to unequivocally state that every image the jury had seen. And she was the last witness, so the government had put on all of its evidence, all the count one images, all the count two images at issue, all the rule 404B evidence. She says that, she's asked, I'm asking you in what you've uncovered here, do you know how many images, or how many are virtual versus how many are actually identified children? Answer. None of the images that we have seen in this courtroom are virtual images. And you know that for a fact? Yes. Okay, yes. Those are all real children. Answer. Those are all real children. So taking that. Seen in the courtroom. Correct, Your Honor. As broad as possible. Correct, Your Honor. Every charged image had been seen to that point. Special Agent Wilkerson testified they're real children. Special Agent Alvin testified they're real children. The jury could tell by looking at the pictures they're real children, all the evidence shows they're real children. Unless there's something else on the sufficiency, can you talk about the obstruction enhancement? Happy to do so, Your Honor. It's important to note that this is a clear error standard of review, and notwithstanding my colleague's comment about the application note, I'd like to get to that in a second. But I'd also... Clear error if it doesn't apply at all under the law? So it's not, it doesn't fit, it's not in quibble over a factual determination, it's just not even in the universe? Correct, that's right. The application note, I think, is not in the universe, so all that's left before the court is the factual finding of whether or not obstruction... Why not? The application... No, I was asking it from the opposite perspective. Oh, understood. The application note, I mean, if there's been no erasing, then it doesn't apply, does it? Well, I don't believe so, Your Honor, and because the application note, I mean, if that application note applied to every situation, then the attempt part of the actual sentencing guidelines would be rendered a nullity, because that application note indicates that essentially anything that is destroyed within a contemporaneous arrest period cannot necessarily, is not going to necessarily lead to an obstruction enhancement unless it inhibits the investigation in some way. But I don't believe it applies in a situation where there's been just a mere attempt like there was here. Was there an attempt here? Absolutely, Your Honor. Do you think there was something besides downloading the software? Well, I think there is. So he searches for a program, it's called D-Ban, and what it does is it doesn't just delete programs, it wipes a hard drive, and this hard drive contained hundreds of images of child pornography used as powerful evidence against him, and at that time, he knew the FBI was searching his house, was looking for child pornography, so he downloads it, and he's looking on the internet for how to run this particular program. And as Dr. Aydes indicated, to run this program, somebody needs some sort of external device to install it on so that they can boot their computer from that device. He indicated to Special Agent Wilkerson that he looked at wiping his hard drive, but he couldn't do it because of a lack of a drive. I don't think he deserves credit for being unsuccessful. I don't think there's anything in the guidelines that suggests that somebody who goes this far along the path of wiping out a hard drive but can't do so because of impossibility rather than some moral sense of what he should do. There's nothing in the record suggesting he could have gotten a thumb drive. He was in Midland. I'm not sure where he was, but there's nothing suggesting he could have done that. You can get a thumb drive pretty much anywhere, can't you? I certainly have trouble getting my hands on one in my office. I don't know in his office if it's readily available. The record is absolutely silent on that point. And this is, I think, a lot like situations in cases to which I cited in my brief for Molle and Flores, where all a party did was call an acquaintance and ask them to delete contents of social media or a digital device, and the 11th Circuit and the 9th Circuit found that that was sufficient. Let me ask you one thing. On your outrageous government conduct, is there an overlap with entrapment? Are they completely separate or the same or some overlap? There is a bit of overlap, but not a complete one. In an entrapment defense, entrapment is foreclosed to a defendant who has shown some predisposition towards the criminal activity at issue, and that's not the standard in the outrageous government conduct field. Now, this court has viewed predisposition as being something that weighs against permitting the outrageous government conduct defense, but the lynchpin, the key for this court's analysis in the outrageous government conduct front, is whether or not the defendant is an active versus passive participant. Where someone has been a passive participant, this court has indicated that the defense is categorically foreclosed, and as I mentioned previously, that's what Mr. Pavlak was here. I'd like to address some of the merits. I mean, I don't think the court needs to reach any of the merits past that, given that if this court has been unequivocal that where someone doesn't show they are more than a or if someone fails to show that they were a mere passive participant. Are we bound by our precedent in other contexts? I mean, given that there are these third-party victims? I think so, Your Honor. I'm not sure that they are. Well, the court has applied the outrageous government conduct defense in a host of fields, and I appreciate the concern about the third-party victims, although the record is silent as to whether they actually exist or not. But in any event, I think the court would be running contrary to its precedent. But you said they're real. Your expert says they're real, so they exist. They do. I mean, the children in the images that Mr. Pavlak downloaded were, in fact, real. That is the case, Your Honor. And they were given the opportunity, I'm sure, to seek restitution from Mr. Pavlak, though that did not occur. But in any event, this court has just never found that this defense applied, and I think it would be creating an intra-circuit split if it were to so find in this case. Should there be special cautions or protections in this area? We haven't written in this area at all. Is this area at all different from regular drug cases and things that we've, you know? I'm not sure. This is a very unique situation. Whether it will present itself again, I think, is unlikely or at least remote. The FBI, don't they do these all the time? Well, in this context, I think the answer is no, Your Honor. This is a really unique situation, which is why the playpen operation was appropriate. Being able to find— They're not doing that anymore as a policy matter? It's not that, Your Honor. It's just the matter of finding an existing child pornography dark web website that is running, that you have access to, is very rare. Do you think it would be different if they had created the site? I think it would absolutely be different if they had created the website. Absolutely, Your Honor. And that's a point the district court made, and I think it was appropriate. If the FBI had created the website, if it had solicited users, if it had done the things that this court has found gets closer to outrageous conduct, like going out and encouraging people to engage in certain behavior, that would pose a closer question than the court faces here today. Okay. Anything else? The court has no further questions. I cede the balance of my time and ask the court to affirm both counts and the sentence against Mr. Povlock. Thank you, Mr. Magnus. Thank you, Your Honor. Mr. Curtis, you have time for a vote. Thank you, Your Honor. May it please the court. I believe that the government's focus on outrageous government conduct is misguided. The government keeps telling this court that the linchpin is whether or not the defendant's participation was passive or active, and I submit to this court that the linchpin is the government conduct. That's the question we have to look at. Now, this court has a rule or has in the past applied the idea that if the defendant's participation is more than passive, then he doesn't get to prevail under the outrageous government conduct. But the Supreme Court has distinguished that outrageous government conduct has to do with the conduct of the government and has in Russell specifically distinguished outrageous government conduct from the idea of entrapment where you have to look at the predisposition of the defendant. And I would assert that because of the third-party victims in this case and because the government violated the law. It just doesn't seem they specifically violated the law. They distributed potentially millions of images of child pornography. Our client would have been indicted. Our client would be looking at 30 years, maybe life, probably life, if they had distributed the number of images that the government distributed in this case. That's what they did. My client had a work computer and he logged into the website. I understand why he got prosecuted. I understand that. But what the government did in this case is the equivalent of letting Daniel Noriega run free. This was the biggest website we've seen of this material. Let him run free so they can get people who are using the drugs on the corner and catch as many of them as they can. That's exactly what they did in this case. And in light of that context, Mr. Pollack was not an active participant in their distribution. He was not. You said that there were some rules that allow this conduct by the government in some other context but not here. Can you explain that a little bit? Absolutely. In a drug case, Title 21, Section 885, I believe, allows the government to use drugs, possess them, do controlled deliveries. Is that true in every area that we've written? In every area of the law? That there was a special exception for the government or not? I'm trying to think of other financial contexts. I'm not aware if there are. If you're dealing with something like guns, then it wouldn't necessarily be illegal for the government to possess the firearms that got sold. It would be illegal for the person who was buying them. So I'm not aware of other areas. But that sounds familiar like that might have been raised at some point in the district court pleadings. In any event, it's the government's conduct that's the linchpin. I'm not aware of any of the cases in this court where the conduct, what they actually did, objectively meets those two criterias where the government continued to victimize children and the government violated the law for two weeks, violated the law to the extent that if they were not the FBI agents, they'd be under indictment right now looking at 30 years to life. One thing I have to get to on the obstruction of justice is that Dr. Ates testified in the record that there were actually seven steps that had to be accomplished. I kept trying to get there, and I didn't. And that's in pages record on appeal, pages 1749 through 1734. He identifies seven steps. Your time has expired now. And, of course, you haven't waived anything that's in your briefs. Thank you, Your Honor. Thank you, Mr. Kurtz. Okay. The case is under submission.